Cecil McLENDON, Don Vandertulip, Jimmie Cartharn, Jr. and Konrad Trojniar, on Their Own Behalf and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

The CONTINENTAL GROUP, INC., a New York Corporation Incorporated in 1913; Continental Can Company, Inc., a Delaware Corporation; Continental Packaging Company, Inc., a Delaware Corporation; the Continental Group, Inc., a New York Corporation Incorporated in 1982; and KMI Continental Inc., a New York Corporation, Defendants.

Civ. A. No. 83–1340.

United States District Court, D. New Jersey.

May 10, 1989.

As Amended June 7, 1989.

Plotkin & Jacobs, Ltd., Robert Plotkin, John G. Jacobs, Jonah Orlofsky, Rose A. Wehner, Chicago, Ill., Daniel P. McIntyre, Falmouth, Me.; Hoffman & Lazear, H. Tim Hoffman, Oakland, Cal., and Robert D. Allison, Chicago, Ill., for plaintiffs.

Bell, Boyd & Lloyd, Edwin C. Thomas, III, Dennis P.W. Johnson, Chicago, Ill., for defendants Continental Can Group, Inc., Continental Can Co., Inc., Continental Packaging Co., Inc., The Continental Group, Inc. and KMI Continental, Inc.

Buchanan Ingersoll, Samuel W. Braver, Pittsburgh, Pa., for defendants Continental Can Group, Inc., Continental Can Co., Inc., Continental Packaging Company, Inc., The Continental Group, Inc. and KMI Continental, Inc.

Riker, Danzig, Scherer, Hyland & Perretti, Nicholas deB. Katzenbach, Douglas S. Eakeley, Morristown, N.J., for defendants Continental Can Group, Inc., Continental Can Co., Inc., Continental Packaging Company, Inc. The Continental Group, Inc., KMI Continental, Inc.

## AMENDED OPINION

SAROKIN, District Judge.

This is an action brought pursuant to Section 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (1982). Section 510 provides, in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

Plaintiffs claim that defendants, through the implementation of a nation-wide scheme to avoid pension liabilities, prevented them from obtaining benefits under the pension plan in violation of § 510.

### Introduction

The defendants [1] in this case found themselves in a declining market because of substantial changes in the can making industry. They further recognized that they faced substantial layoffs and huge potential unfunded pension liabilities as a result. They concluded that continued employment would permit large numbers of employees to qualify for those benefits unless action was taken to prevent them from doing so.

Accordingly, defendants developed a sophisticated computer program which enabled them to identify those employees who had not yet qualified and who therefore, should be and were targeted for dismissal. The same computer system kept track of the employees so laid off in order to prevent the resurrection of their rights through inadvertent recall.

The plan was shrouded in secrecy and executed company-wide at the specific direction of the highest levels of corporate management. It was intended to save hundreds of millions of dollars in unfunded pension liabilities. The evidence of the plan, its secrecy, and its execution comes from the files of the defendants themselves. The documents are more than a smoking gun; they are a fusillade.

1. Defendants have stipulated that a judgment against any one shall constitute a judgment against all and, therefore, no attempt will be made during the course of this opinion to distinguish among the various defendants.

The evidence in support of plaintiffs' claims has been known to and possessed by the defendants since the inception of this case. Nonetheless, defendants have denied the existence of the plan and its implementation. For a corporation of this magnitude to engage in a complex, secret and deliberate scheme to deny its workers bargained-for pension benefits raises questions of corporate morality, ethics and decency which far transcend the factual and legal issues posed by this matter.

The issues to be decided in this portion of the case arise from Continental's claim "that the illicit objective of the Liability Avoidance Program was not a determinative factor or that, if it arguably was, other factors clearly predominated and would have resulted in the same layoffs in any event". (Defendant's Trial Brief, p. 4). The *Gavalik* case, which this court has utilized to establish the guidelines for this matter, provides as follows:

Continental must then be afforded the opportunity to present evidence that as to any particular individual class member's request for relief, that individual is not so entitled because in the absence of Continental's illegal plan that individual would have been without work at the same time in any event. We do not foreclose an opportunity for Continental to submit its proofs collectively as to all of the plaintiffs. That is, if the proof as to each individual is the same, there is no requirement that Continental repeat the same evidence for each claimant. Continental must establish either collectively or individually that class members would have suffered the same loss of work even in the absence of the illegal plan. Continental's burden on this issue will be one of persuasion.

*Gavalik v. Continental Can. Co.*, 812 F.2d 834, 866 (3d Cir.1987).

In view of the foregoing, this court concluded that it would be appropriate in the interests of efficiency and economy to determine the issues outlined above at a test trial involving one of the plants, since such determinations would dispose of other issues or render them moot. In addressing the factual matters presented, the court at the outset wishes to outline its view of the respective burdens upon the parties. Plaintiffs, of course, have the ultimate burden of proving that Continental acted with the specific intent to interfere with the attainment of Magic Number pension benefits in connection with layoff decisions. Plaintiffs must establish by a preponderance of the evidence that the avoidance of such pension benefits was a determinative factor in the layoffs by Continental. Defendants concede that they have the burden of both production and persuasion as to the alleged "same loss defense". If Continental were to prove that plaintiffs would have sustained the same loss in any event, plaintiffs would be unable to succeed, and thus the focus on this issue initially. The court proceeds on the basis that the respective burdens are subject to a preponderance of the evidence standard.

The court's factual findings are as follows:

*Industry Background*

Before the 1960's, almost all cans were three-piece tin-plated steel. A typical three-piece line for the making of such cans cost between $750,000 to $1,000,000. Additional equipment for end-making and lithography substantially increased that cost. Two-piece lines were much more expensive but required no separate lithography equipment, and because they needed only one end, certain expenses involved in three-piece equipment could be avoided. It was essential, because of the large capital investment, to maintain high levels of line utilization. It is undisputed that two-piece lines, while more expensive initially, were less labor intensive in actual operation.

In the 1960's, development of two-piece aluminum cans occurred, and the process permitted standard sized can bodies and bottoms to be formed at high speeds. It also eliminated the lithography, coating and coil departments required for three-piece can making. Plants which had been

designed for three-piece production did not easily convert to two-piece aluminum can equipment, although such conversion was feasible depending upon specific conditions.

There were three primary markets for can makers: food, general packaging and beverage. In the 1950's food cans were the largest segment of the domestic can business, but the beverage demand grew significantly because of beer and soft drinks. In the 1960's, the beverage market was the largest of the three and continued to be so through the relevant time period of this litigation.

One of the reasons that the food can business declined was because food canners began to self-manufacture their own cans. The Campbell's Soup Company, which was one of the nation's largest users of food cans, became one of the market's largest self-manufacturing companies. Other major consumers also began to meet their needs by self-manufacturing, and, indeed, they began to sell cans on the open market and competed with companies such as Continental and American Can Company. In addition, overall sales of canned food declined because consumers viewed it to be not as fresh as other types of food. Cheaper forms of packaging also replaced steel in the food market. Many of the small manufacturers which utilized cans went out of business. Therefore, there was a substantial reduction in the food can business for Continental as well as others in the industry.

General packaging was always the smallest part of the can industry, and this segment of the market was serviced by numerous manufacturers, including many smaller companies. Here again, substitute forms of packaging such as plastic reduced this market. Except for aerosol cans which briefly flourished and then diminished because of environmental considerations, most general line business declined for Continental.

The market for beer and soft drinks, however, sold in cans, substantially increased after World War II. Metal cans replaced glass as the package of choice in the beverage market. Can companies, including Continental, built a number of factories in response to that demand. Continental continued to concentrate on its proprietary three-piece steel cans during the early period and built many factories, particularly near customer locations in order to meet this demand. Continental opened 27 such plants between 1969 and 1971, and by 1974, 60 percent of Continental's beverage cans were produced at such plants. The growth of the beverage can business was attributed to increased consumption, consumer preference for convenient packaging, and the increasing reluctance on the part of retailers to utilize returnable bottles.

Tin-plated beer cans had a problem with iron pick-up which affected the look and taste of beer. In 1965, tin free steel was developed to avoid this problem. In addition, the ring-pull beverage can top appeared in 1963, and accounted for 40 percent of all beer cans sold in that year. Indeed, the convenience increased the demand. The ring-pull tops, however, were aluminum and thus forecast the entry of aluminum into this business. The number of breweries substantially decreased, however, and of the original 700 which existed in the country, by 1977 only 47 remained.

The most substantial reason for Continental's loss of business in the beverage area was its failure to convert to two-piece aluminum. Continental used a proprietary technology called Conoweld. The two-piece aluminum beverage can totally revolutionized the industry. It was developed by Coors, and was adopted by many beer producers and soda manufacturers thereafter. By 1965, five of the major breweries began packaging at least a portion of their beer in aluminum cans. The aluminum cans were successful because they did not pick up the metallic taste, had a lower weight, a quicker chilling time, and were more attractive because they did not have a seam. The cans cost less than steel and were less subject to leakage. As a result, by 1979, 91 percent of the beverage business was in

two-piece aluminum cans. Aluminum also had the advantage of recycling. Unlike the steel cans which rusted and decomposed, aluminum cans had the ability to survive the elements for years. The same trend developed in the soft drink can market, and ultimately two-piece aluminum had the major share of that market as well.

As a result of the foregoing, companies such as Continental and American Can, which were the major producers of steel cans, had obsolete factories and required capital for two-piece line investments. Employment growth in the industry declined and many workers were underutilized. Particularly due to the self-manufacturing by major past consumers, and the predominance of the aluminum technology, companies such as Continental and American were faced with aging equipment, outdated facilities and excessive labor. Changes to two-piece beverage production required a reduction in the labor force because the two-piece lines were less labor intensive than their three-piece counterparts. Therefore, the court concludes, and specifically finds, that economic conditions warranted restructuring and layoffs by Continental during the relevant time period.[2]

In the late 1960's Continental had become the leading producer of metal cans in the United States, and was responsible for the manufacture of approximately one-half of all the beer cans consumed in this country. As a result of the foregoing conditions in the marketplace, Continental's predominance in the industry was substantially reduced.

American Can, which had always been Continental's primary competitor, faced identical problems. As Continental turned to Conoweld as its technology, American invested in a Miraseam technology. Neither was able to stave off the competition of aluminum cans. Even in the metal can

industry, competitors emerged which also affected the market share for Continental and American. Likewise, major competitors entered into the aluminum can business, such as Jeffco, which was assisted by Coors in its development. The greatest loss of business came from the self-manufacturing of the major consumers, and, in particular, such companies as Anheuser-Busch and Schlitz.

To some extent Continental places blame upon the United Steel Workers Union for its predicament, asserting that the labor contracts were such that it further exacerbated Continental's competitive disadvantage, a contention which this court need not resolve. The effects of such contracts are, of course, relevant, but how or by whom they were initiated is not.

*Continental's Response to the Declining Market*

Reading the writing on the wall, Continental determined to hire the Boston Consulting Group (BCG) to conduct a study to determine what strategic approach Continental should take in respect to its metal can business. BCG initially did a study for Continental's beverage division in 1971, and in December of 1972 recommended that a study be conducted of the entire domestic metals division. Such a study was conducted and a presentation made in 1973. In essence, BCG recommended that Continental diversify its investments away from metal can making and towards businesses more likely to grow. It recommended an increase in its cash flow and that strategy was implemented. BCG also recommended that there continue to be investment in the soft drink and aerosol business, but generally recommended that Continental attempt to generate as much cash as possible to use for more productive investments. Pursuant to that overall strategy, attempts were made to increase productivity while at the same time reduce costs. Some of those efforts were directed at the elimination of the hiring of seasonal workers, spreading vacations and production schedules, and

---

**2.** Continental submitted numerous depositions in evidence which confirm the foregoing findings regarding the general industry conditions.

utilizing overtime in lieu of recalling workers. Although not necessarily relevant to this action, the court notes and finds that other recommendations of BCG were followed in that Continental acquired a number of new businesses unrelated to metal cans.

The court accepts without question the opinion of Dean Blaydon of the Amos Tuck Business School that industry conditions required that strategic changes be made; that diversification and cash generation were appropriate goals; that realignment and reduction of the work force were necessary; and that better utilization of the work force and assets was necessary and proper. In pursuing the foregoing, calculation of all costs including pension liabilities was consistent with good and accepted business practice. The issue, of course, is what use was made of that information not whether it was appropriate to gather it.

Thus, the court finds that Continental was entirely justified in seeking ways to reduce its costs and improve its productivity and generate cash. The question remains, however, for the court to determine whether or not in pursuing those goals Continental illegally sought to avoid liability for pensions, and whether such purpose was a determinative factor (a motivating consideration) in its decisions and the actions taken pursuant thereto in violation of § 510 of ERISA.

One of the ways in which Continental responded to the foregoing conditions was to create its Management Services Program (MSP). This program allowed Continental to use an extended lease agreement with a customer to obtain financing. In essence, it permitted Continental to recapture the capital cost and interest for the equipment necessary to establish a new two-piece production line. Continental utilized MSP beginning in the 1970's primarily for two-piece aluminum can contracts. By leasing the equipment Continental was able to recoup its capital investment and interest and assure purchase of its services over a fixed term.

In further response to the economic climate in which it found itself, Continental also engaged in strategic planning intended to make projections over a five-year period. The details of said strategic plans will be discussed more fully hereafter.

Continental generated numerous reports to track its costs and profits, and initiated a number of cost reduction measures. Included in these were programs to reduce the weight of the metal used in can bodies and ends, the construction of service centers and the use of larger sheet sizes. Lithography costs were also reduced. Job combinations were implemented, and certain jobs were eliminated as a result. In addition, throughout the relevant period Continental was concerned with pension liability arising out of an agreement with the United Steel Workers. Two major provisions, known as "Magic Number" pensions, provided the basis for this concern.

An employee who qualified for a 70/75 pension could elect to retire before age 62 and receive a lump sum retirement allowance covering the first three months of retirement, and after those three months a 70/75 pension. A 70/75 pension was equal to the normal pension. In addition, the employee received a monthly supplement of $300 until eligible for social security, normally until age 62. In order to qualify for a 70/75 pension an employee had to meet the following requirements:

a. The employee's regular continuous service was broken by his or her absence for at least two years as a result of a permanent plant shutdown, involuntary layoff or physical disability; and

b. The employee completed at least 15 years of regular continuous service and was 50 years of age or older with combined years of age and regular continuous service equal to 70 or more; or

c. The employee completed at least 15 years of regular continuous service with combined years of age and regular continuous service equal to 75 or more.

An employee not entitled to retire on a 70/75 pension whose last day worked was on or after March 1, 1977 who qualified for a Rule of 65 pension could retire before age 50 and receive a lump sum retirement

allowance covering the first three months of retirement, and after those three months a Rule of 65 pension. A Rule of 65 pension benefit was equal to the normal pension. In addition, the employee received a monthly supplement of $300 until eligible for social security, normally until age 62. The supplement payable was reduced by $1 for each $2 of income earned by the employee in excess of $4,500 in any year after retirement and before attainment of eligibility for social security. In order to qualify for a Rule of 65 pension, an employee had to meet the following requirements:

a. The employee's regular continuous service was broken by absence for at least two years as a result of a plant shutdown, involuntary layoff or physical disability, or Continental decided prior to that time that it was unlikely that the employee would return to work;

b. The employee completed 20 years of regular continuous service as of the last day worked;

c. The employee had not attained age 50 and his/her combined years of age and regular continuous service equaled 65 or more but less than 75; and

d. The Company had not provided the employee with suitable long-term employment.

Robert Petris [3] had been a long term USW employee and was very active in the negotiations on behalf of the Union. He testified in deposition testimony that the purpose of the Magic Number pensions was either to prevent the can companies from shutting down or to provide benefits in the event of such shutdowns. It was recognized that the benefits would make plant closures expensive and, therefore, deter them. Ralph Biggs testified to the same effect as to the purpose of the Magic Number pensions.

In 1971, Continental did not attain its budgeted sales and income and, as a result, reevaluated its position. An extensive realignment program was considered and a reserve was established in 1972, called the Extraordinary Charge Authorization (ECA), in the sum of $231,000,000. The expectation at the time was that the realignment would result in business growth rather than decline. Primarily, the ECA was utilized to write off liabilities which included labor costs incurred through work force reductions, charges for removing excess and obsolete equipment, and for transportation expenses for machinery moved from one factory to another in order to consolidate production. The need for this program arose from most of the conditions outlined above.

ECA was succeeded by the Plant Utilization Program (PUP), and once again a reserve was established in the approximate sum of $100,000,000, but the source of this reserve was the income of the can company. PUP reserves were created so as not to charge local managers with certain costs over which they had no control. Whereas ECA was intended to position Continental for a growing market, PUP anticipated a declining market. PUP contemplated closures or reductions in plants. Continental claims that PUP's purpose was to size the company to available business so that Continental could fully utilize its facilities and reduce its capital investment.

In the mid–1970's, Stephen Rexford, Continental's Manager of Employee Relations and Strategy Planning, devised a computer system known as the Bell System. Bell I was followed by Bell II. The Bell systems employed scattergraphs, which were computer printouts depicting a plant's work force at a particular point in time. The scattergraphs assigned codes to each employee. Continental admits that it often referred to the goals of the Bell Systems as "the Liability Avoidance Program", which had two aspects:

(a) sheltering or keeping employed 70/75 qualified employees so that their employment was assured throughout their normal careers; and (b) preventing further

---

3. To be attached hereto and made a part hereof and designated Appendix A will be a stipulation of counsel designating the respective positions and offices held by the persons referred to during the course of this opinion. Accordingly the court will not set forth such offices and positions in the body of its opinion in every instance.

employees from qualifying for 70/75 pensions.[4] (Defendant's Proposed Findings of Fact # 368, page 118.)

In essence, Continental contends that its main objective was in maintaining antiquated, marginally profitable plants to keep senior workers employed, concluding that it cost less money to operate an inefficient plant with a dwindling customer base than it did to absorb the expense of shutting it.

*Liability Avoidance Program*

As set forth above, the original 70/75 Magic Number pension came into existence in 1971, and the Rule of 65 pension came into existence in the 1977 contract with the Steel Workers Union. Soon after these pensions became part of the collective bargaining agreement, Continental became concerned with them, particularly due to the fact that they were in large part unfunded. The more apparent it became that the business was in a declining mode, the more likely it became that Continental would have to concern itself with this potential liability. Continental realized that as additional employees gained the requisite age and service requirements, its liability would increase, and that one of the ways to avoid this occurrence would be to prevent those employees from meeting the necessary requirements.

The documents which come from Continental's own files are replete with evidence not only of the creation and existence of Liability Avoidance Program but of its implementation throughout the company. The court in rendering its opinion in this matter will make no effort to review the testimony of each and every witness or set forth each and every document which clearly supports the existence and operation of this program designed to deprive Continental employees of attaining the requirements necessary to entitle them to Magic Number pensions. Where the testimony of defendants' witnesses[5] has purported to

contradict the clear documentary evidence, the court specifically finds that the documents created at the time accurately reflect what transpired and clearly are more credible than the testimony of the witnesses many years after the events.[6] No contemporaneous document has been produced by defendants which directly challenges either the existence, propriety, or implementation of the Liability Avoidance Program.

Liability avoidance was calculated by reference to the Bell System referred to above, which provided Continental with information as to who should be laid off and who should be kept on layoff in order to avoid the vesting of such liabilities. From the outset, this plan was devised and operated in secrecy. Indeed, the name Bell is a reverse acronym standing for "Lowest Level of Employee Benefits" or "Let's Limit Employee Benefits".

The fundamental principles of liability avoidance are set forth in the Bell User Manual (PX 754 at 185271) as follows:

*Liability Avoidance*

There are two fundamental principles contained in the concept referred to as avoidance. First, we must be very careful that our plans make every attempt to avoid, insofar as practicable, triggering liabilities already vested in 70–75 qualified employees. Secondly, we must, wherever appropriate, shrink and cap our work forces in order to prevent currently inexpensive D.V.B.'s (Deferred Vested Benefit) from migrating into the very expensive 70–75 category. (PX 754 at 185271)

Pursuant to the plan, the goal of avoiding these unfunded liabilities was a determinative factor, and usually the prime factor, in deciding what plants to close or continue open, what work to accept or reject, where that work was to be performed, what jobs should or should not be com-

---

4.  During the course of opening Continental purported to retreat from "(b)" above, but the evidence submitted conclusively supports this goal.

5.  The court questions (without ruling on) the propriety of counsel for the defendant entering

into "consulting agreements" with a number of anticipated *fact* witnesses.

6.  Only one document was ordered confiscated and destroyed by Mr. Bainton, but that was due to other faults which he found with it.

bined, and who should and who should not be retained or laid off. The proof in support of the plan and its implementation is so overwhelming that if plaintiffs were required to meet a beyond a reasonable doubt standard, they could have done so. Indeed, the court questions the good faith of Continental throughout this litigation in denying even the existence of the plan, in view of the clear documentary evidence to the contrary, all of which comes from its own files. The plan existed, it was implemented nationwide, and it directly affected thousands of Continental's employees.

The plan began approximately in 1971. At the suggestion of Mr. Walter Klint, the company began making estimates to determine what the shutdown liability would be and whether action should be initiated to avoid having additional employees become eligible for Magic Number benefits.

As stated above, the Liability Avoidance Program had two prime goals: 1) continuing employment of those who had qualified and 2) permanently laying off those who had not yet qualified. The second goal was a constant and vital factor in the major decisions by management as is demonstrated by the following document produced by Continental:

CONFIDENTIAL

In order to develop a 1977 liability avoidance for each plant it is necessary to standardize our approach to the recording of liability avoidance. The total liability avoidance number should appear on Exhibit G in column number 10 under "People Cost Avoidance".

&ast; &ast; &ast; &ast; &ast; &ast;

B. Liability avoidance is also confirmed when employees with a D.V.B. (Deferred Vested Benefit) or less are permanently denied the 70/75 benefit. Identifying this type of avoidance will be done in the following manner.

1. Process the employees declared on permanent layoff (line 1.A of Exhibit II) through the Bell system with an effective date of 12/31/87. In our example, the 480 people cost 9.6 in 1987.

2. Subtract the cost of capping (3.2MM) from the above. This net number is

avoidance future liability by capping on the date displayed in the Strategic Plan.

9.6  Cap Cost 1987
3.2  Liability triggered 1978 by capping.
&mdash;
6.4  (PX 326 at 017141).

It can be fairly argued that no company in a declining market should be required to make decisions regarding shutdowns and layoffs without calculating or considering the economic costs. However, it is also axiomatic that avoiding pension liability costs will *always* result in a savings in the event layoffs occur of those who have not yet qualified. The mere fact that profits are increased or losses reduced cannot justify every instance of intentional liability avoidance. If economic benefits were sufficient justification, then there could never be a violation of the pertinent statutory provision. 29 U.S.C. § 1140; *cf. Gavalik,* 812 F.2d at 857, n. 39 ("(510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employee(s) or by a general concern for the economic stability of the company").

█  The court wishes to emphasize, at the outset, that it finds nothing either illegal or improper in a company estimating its potential pension liabilities in the event of a plant shutdown. No competent management would consider such action without doing so. However, the issue presented in this matter is whether avoidance of pension liability was the motivating force in the company's decisions or merely a result of the decisions so made. For the reasons hereinafter set forth, the court finds that avoidance of pension liability was the prime catalyst for such decisions and so pervaded the thinking and goals of the company that it affected all of the decisions regarding the retention or layoff of employees.

As early as May of 1973, Mr. Klint recognized not only the need to lay off those who would otherwise vest for the Magic Number pensions, but indicated the need to "weigh very carefully calling people back

who are already on layoff". (PX 14132) Eventually, the company determined that it could best accomplish its purposes primarily by "capping and shrinking" plants rather than by closing them.

The definitions of "cap and shrink" are clearly set forth in company documents:

Cap, shrink, or close action should be briefly explained—or reason for no action should be rationalized under "comments". A *cap* is defined as a workforce reduction in order to reduce unfunded people liabilities. A *shrink* is defined as a workforce reduction due primarily to market or manufacturing considerations. (PX 351A at 048505)

The documents are not casual interoffice memos but rather are highly formal and were widely circulated. They are incorporated into the strategic plans for the company. (PX 6072A at 0155352)

Some of Continental's witnesses suggested that "capping" meant only protecting senior workers. Certainly persons engaged in the can making industry understood what the word "cap" meant. It meant putting a lid on, affixing a top—just what the ordinary person would understand. If it meant only to shelter persons above a designated line, certainly a more descriptive word could have been found than "cap." Attempts now to assert that it meant something else are not credible.

The concern with Magic Number pensions was so great that the company considered shutting down certain plants and constructing others or even surrendering business in order to avoid the liabilities, as is apparent from a letter dated February 22, 1974, which considers the following:

(a) Retaining the business formerly serviced by the [representative] plant that was either shut down or having a 50% reduction in the work force by constructing another plant and manning[7] this plant with a like number of employees equal to the number laid off at the old plant, and

(b) merely giving up the business manufactured by the people who were either laid off or victims of a plant shutdown. (PX 11845)

Also germinating at this time was consideration for eliminating the United Steel Workers entirely from the Continental plants in order to totally avoid and end these pension benefits, as well as to rid itself of what it deemed to be high labor costs as a result of the collective bargaining agreements made with the union.

In March of 1974, there was a meeting of top management, at which time it was recognized that, whereas under the 1971 contract a 70/75 pension at age 53 was worth $58,000, under the new 1974 agreement it became worth $75,000. The effort to deal with this problem continued as did the fact-finding necessary to make determinations. Scattergraphs were created depicting the effect of the 70/75 pension benefits.

The desire to avoid these benefits is confirmed in a letter dated November 21, 1974, from Mr. George Swick of Buck Actuaries, engaged by defendants, wherein he writes the following:

As I recall, this concept was first discussed with me sometime after the calculation of the extraordinary "people cost" prepared with respect to the proposed reorganization of the Metal Group, the initial concept being the possibility of avoiding '70–75' or '75–80' early retirement benefits. (PX 25609)

In the report of the Boston Consulting Group referred to hereinabove, the company emphasized the importance of finding creative alternatives for the Metal Operations Group to reduce its unfunded pension liability (PX 23210). Until 1975 and the inauguration of the PUP program, efforts at liability avoidance were somewhat haphazard. However, PUP established a comprehensive plan to reduce pension liabilities:

P.U.P. is a least cost operating plan aimed at reducing our people cost expo-

---

7. The word "manning" has been used by the parties and witnesses throughout this trial. Therefore, although the court would prefer not to use a masculine word to describe an activity which also includes a large number of women, its repetition and accepted use as a term of art throughout these proceedings necessitates its adoption in this opinion.

sure (principally the '70/'75 issue) and our asset base. This objective will be accomplished by withdrawing from the least profitable business segments. This requires shutting down or shrinking plants, which ever alternative shows the best economics. (PX 325 at 017133)

The official policy became "cap and shrink", which was understood and confirmed to be a work force reduction in order to reduce unfunded people liabilities. (PX 351B)

Eventually, the program memorialized the earlier suggestion that heed be paid to not recalling laid off workers for fear that their benefits would be resurrected, and thus the "red flag" control procedure was established. (PX 17190)

From that moment on the Continental documents are rife with confirmation that the effort was to be made to minimize Magic Number pension liabilities, and that to do so was the single most important problem facing Continental. Continental's 1980 Labor Strategy states:

> The most important concern facing us is the liabilities associated with the 70/75 and Rule of 65 pension programs and the guaranteed SUB (Supplementary Unemployment Benefits) program which restrict our flexibility in realigning our facilities to fit changing market conditions. (PX 3701A at 012533)

The company's Strategic Review completed in early 1980 emphasized the size of the potential unfunded liabilities, stating that the "foremost strategic problem is the size of the USA labor liability". (PX 6054) The concern at this stage was so great that means were considered to insulate the other Continental entities from this liability and establish CCC–USA as a separate legal entity. The emphasis on this prime goal was carried out in all subsequent strategic documents. The 1981 Strategic Plan emphasized the absolute nature of the "cap and shrink" restrictions for managing the liability problem. (PX 50004) The 1982 Strategic Plan listed as the prime strategic objective to minimize unfunded pension liabilities. (PX 20642) A 1983 paper entitled "CCC–USA Human Resources White Pa-

per" identified the role of management as a "pension liability controller". (PX 5008)

Typical and significant of the documents coming from the files of Continental is the following:

> II. "Cap and Shrink"—This is a strategy that involves "capping" the work force in a plant at a level that does not allow any more employees to become eligible for Rule of 65 or 70.75 pensions. In the ideal situation, we would lay off all employees with 19 or less years of service.
>
> The second part of this type action is to allow natural attrition to reduce the remaining work force to a level where if desirable we could "afford" to close the plant. (PX 3701A)

The court finds that Continental's plan and goal was to lay off those steel workers whose benefits were not yet vested and, indeed, attempt to rid itself of all steel workers eventually.

Although halfheartedly continuing to contend that the Liability Avoidance Program did not exist, defendants in this hearing sought primarily to offer evidence that even if the program did exist, it was not implemented, and that decisions were made free and independent of the goal of avoiding Magic Number benefits. Here again, the evidence to the contrary is overwhelming, and comes solely from the files of Continental. Defendants have presented evidence that some of the internal projections may have been fallacious and failed to take certain factors into consideration; but none of that affects clear evidence that accurate or inaccurate, the avoidance of liabilities and the projections made for that purpose were the guiding force for the actions taken. Whether or not the projections were valid is irrelevant, if they were believed at the time and relied upon in the decision-making process.

To conclude that the program was not being carried out at the local level would be to ignore the contemporaneous documents of the time. For instance, in 1976, Mr. Rexford, who was Continental's Director of Labor Relations and Strategic Planning, called a meeting "to verify that these pro-

grams are processing employee benefits calculations." (PX 4070)

The Liability Avoidance Program was defined as follows:

*Cap & Shrink* —Implementing a pre-determined, upper level of employment known as a cap in order to:

–Prevent future growth of unfunded liabilities.

–Shelter or protect the existing liabilities of the residual workforce.

–Achieve *maximum* cost avoidance which is defined as implementing the "ideal" cap that produces *maximum* avoidance of unfunded liability growth. The cost/liability of putting the cap into place is substracted [sic] from the avoidance of liability growth.

–Lastly, we have equipped the Bell System with a red flag system that insures that no caps can be "broken" once put into place. We assign a special code to employees who have been displaced as a result of a capping action. Should an attempt be made to return them to active status, a red flag report is generated which identifies the employee and the plant where the violation took place. (PX 733 at 106778)

As indicated, first the decision was made as to the ideal cap, one which would achieve the maximum amount of liability avoidance. Then, if necessary, the business would be sized to the predetermined cap, and if reductions were necessary, business would either be reduced or reassigned to other plants or internal changes would be made to accommodate the existing volume. Most significantly, the layoffs were monitored through the computer system to make certain that the advantages attained through the layoffs would not be lost through some inadvertent recall. Capping was accomplished by drawing a line on the seniority roster, and those below the line were laid off. Scattergraphs and the Bell Systems were utilized to direct and monitor the program. Bell Systems calculated the estimated unfunded liability and identified those employees who were or would become entitled to Magic Number benefits and when.

Scattergraphs and seniority rosters were utilized (once generated by Bell II) to provide the necessary information to determine "when an action should be taken to avoid the greatest increase in liability". (PX 712)

Memorialization appears in a strategic plan developed by Continental's Coastal Operations Division, which contains the following:

[W]e must, if practical, shrink and cap our work forces in order to prevent currently inexpensive D.V.B.'s [Deferred Vested Benefits] from acquiring enough points to attain the very costly 70/75 category. (PX 6570 at 410479)

That the business was to be adjusted to the capped work force rather than the reverse is confirmed in a personal and confidential report prepared by Mr. Rexford, dated July 6, 1977, in which he states, "This represents a departure from the past where most of our locations needed only to adjust their manning to fit the available business at any given point in time. We now find it necessary to begin thinking about fitting the business to the available manning". (PX 368 at 57636). That same document again confirms that the goal was to obtain and assign work to gain the highest return "at the least exposure to the increased unfunded liability". And, finally, in that same document he states "cap implementation is the effecting of a liability avoidance plan".

Throughout the pretrial proceedings in this matter and during this trial Continental emphasized the fact that many of the purported class members were far from vesting, and that it was too remote or speculative to include them as class members even if the plan existed and had been implemented. First, the court finds that the overall long term strategy was to end the employment of all United Steel Workers, but even short of that goal the projections of unfunded liability costs were predicted through the year 1995 and even into the year 2000. (PX 12504 at 475530) Therefore, it is clear that this was a long-range strategy that even affected those who might have been remote from vesting

at the time of layoff. In any event, to get at those close to vesting, it was necessary to lay off those further distant.

Although Continental contends that the plan (whose existence it denies) was not implemented, and that decisions were made at the local level irrespective of the plan, the documentary evidence is to the contrary. A July 6, 1977 report authored by Mr. Rexford, but issued by Mr. Bainton who at the time was at the head of Continental USA, advised in a personal and confidential communication that implementation of the plan was mandatory. (PX 368 at 57635) Although the St. Louis plant will be discussed in more detail hereafter, the evidence demonstrates that the St. Louis Plant was a pilot plant for Bell II. (PX 20921 at 991031)

■ The evidence presented not only demonstrates the creation of the Plan, its intended implementation and its ongoing implementation, but recites in retrospect each of the foregoing and its success. A 1981 Strategic Plan contains the following, referring to the program: "These restrictions have been usefully applied over the past 5 years and continue to be appropriate for managing our liability problem". The restrictions referred to are set forth as follows:

Current labor policy is based upon several primary tenets:

–"CAP" Steelworker plants at seniority levels selected to most effectively balance current cost of implementation with avoidance of future liability increases.

–Once established, the "CAP" is absolute. Recall below the "CAP" is forbidden.

–"SHRINK" capped workforces through normal attrition so that liabilities decline.

–Hire no new Steelworkers to reduce their monopoly of our workforce.

–Major new plant investments limited to non-USW facilities for further effective segmentation. (PX 5004 at 129597)

Any doubt that the Bell System was a force in the decisionmaking rather than merely an informational tool is dispelled by a confidential presentation to the executive office, dated May 14, 1980, by Mr. Hofmann, Executive Vice President of The Continental Group, Inc. and President of Continental Can Company, in which he states:

In order to provide the vehicle to help manage our unfunded people cost liabilities, a computer system was developed that analyzes and calculates our work force liabilities, both current and future, under variable conditions. This computer system, titled 'Bell System,' has become an important strategic planning device as well as a tactical working model to aid in work force management.

Using the 'Bell System' we are able to determine the proper specific level to implement a 'cap,' in which the work force is reduced to a predetermined employment level, then allowed to shrink over time through attrition. This 'cap & shrink' work force management technique:

–Limits future growth of unfunded liabilities.

–Provides a disciplined manner to align volume and facilities to 'shelter' or protect the existing liabilities of the 'capped' residual work force.

–Achieves *maximum* cost avoidance, which is defined as implementing the "IDEAL" cap that produces *maximum* avoidance of unfunded liability growth. We are able to assess the trade-off or benefits of the cost to impose the cap action vs. the savings in future unfunded liabilities.

–Provides the vehicle to contain and then manage down, overtime, the current, substantial, people cost unfunded liabilities. (PX 294 at 002969)

Codes and scattergraphs were used to accomplish this purpose. Richard M. Sylte was typical of the type of testimony elicited from Continental employees. He insisted that the status codes were for accounting purposes only and not to carry out any nefarious scheme. He also attempted to define "cap" in a way contradicted not only by the documents but by the actual practic-

es of the company. Neither he nor any other witness ever explained why, if manning levels were merely meant to service the existing volume, it was necessary to determine a "cap". One would assume that every company seeks to employ a labor force no greater than it needs to produce its existing volume. It is obvious that capping was a new and different strategy for a different purpose. Any other interpretation defies reality. The purpose and effectiveness of the plan was summarized in October 1979 as follows:

> The principle of capping and shrinking the work force in plants has as its goal the shut off of new entries of steelworkers into the high labor liability classifications. This has been quite effective with a large reduction of personnel in USW units occurring over the past four years. (PX 400 at 083378) [8]

In order to accomplish the aforesaid purpose and yet minimize the loss of business, it was necessary to consider shifting business and only, if necessary, rejecting it. Management was advised it would be necessary to shift volumes and absorb larger freight costs if necessary, and even sacrifice economic maximization in order to further the objective of liability avoidance. (PX 5227) Transfers were made pursuant to that policy, including and involving St. Louis. The labor strategy employed by Continental clearly contemplated the transfer of business and equipment to other plants, and if that could not be accomplished in certain instances, to give up business if it became necessary. A retrospective prepared by Continental in 1983 states:

> During this period, plants were either closed, shrunk or realigned as business was lost or abandoned. In total, CCC–USA consciously chose to leave nearly 30% of its business. We had been, in fact, liquidating the business. (PX 5008 at 108107)

Numerous speeches and internal memoranda confirm that, if necessary, the goal of liability avoidance justified the voluntary surrender of business. The strategic review of 1980 again emphasizes that "the foremost strategic problem is the size of the USA Labor Liability", and suggests that volume and business should be geared to "accomplish its strategic labor force management goals". (PX 6054 at 085924) The same theme is repeated in numerous other documents and management speeches. As a result of a reduction in the work force, those who remained were expected to work unusual amounts of overtime. By this means recalls were avoided.

The court wishes to make clear that it does not find that each and every management decision as to what work to accept, reject or continue, or where that work should be performed, was necessarily motivated by the Liability Avoidance Program. However, the court does find that the goal of avoiding liability so pervaded virtually all of such decisions that it would be impossible for the court to determine which, if any, were free of this overriding purpose. Obviously, not every decision to economize or make the operation more profitable can be attributed to this program. But the court finds without doubt, that the decisions to lay off workers and not recall them were uniformly driven by the goal of avoiding Magic Number pension liability. Other considerations were merely collateral.

Despite the repeated assertions of Continental's witnesses that many of the documents do not accurately reflect company policy and practices, no document has been presented to the court in which any of those statements were challenged or criticized *at the time*. Quite to the contrary, the documents were frequently approved and further circulated.

Clearly, the program contemplated having the business fit the capped work force rather than having manning decisions dependent upon the volume of business. Mr. Rexford recognized at the outset that such a program would be interpreted by employees and "even the management ... as an unfair and deliberate attempt to deprive

---

**8.** Mr. Sloan, the author of this document, claimed that he did not have knowledge to support these conclusions.

employees of benefits due them". (PX 20929 at 991077) He further recognized that traditional considerations for assignment of work might have to be abandoned.

We must realize that there are some potentially disturbing implications of workforce management decisions in regard to management employees. Since many of the liability numbers are extremely compelling, it is conceivable that traditional considerations such as efficiency, quality, service and productivity may be disregarded by the need to shelter 70–75 liability for a period of time, thereby causing the transfer of volume from a "deserving" to an "undeserving" plant. The reaction of local managers to this type decision, absent of careful explanation, could trigger a severe morale situation. In making the decisions that are right for the long term business future, every effort must be made to preserve the middle management team upon whom we will be depending to run the future business. The following hypothetical case illustrates the problem: Plant A has recently completed twelve months of difficult work with the local union on job combinations, eliminations, float control, productivity and quality improvements. As a result, plant A becomes a least cost location and is considered for a significant volume increase. At this point, scattergraphs are generated and it is demonstrated that the employees who would return to work as a result of the new volume are all expensive DVBs. Meanwhile, "B" plant undergoes the same analysis and it is discovered that the new volume would shelter 70–75 pension commitments. The volume goes to Plant B. It is not hard to imagine the bewilderment of the manager at Plant A, much less his supervisors. (PX 782 at 028477)

Abandoning traditional considerations such as "efficiency, quality, service and productivity" indicates quite clearly the extent to which the avoidance of liability dominated all management decisions. Normal business considerations were abandoned in pursuit of this overriding goal. Monte Sellers testified on depositions, that for the period between 1976 and 1978, he compiled the regional budget for the 857 Great Lakes Region based upon expected sales volume. He admitted that Continental shifted business, but alleged that it did so in order to shelter senior employees. He admitted being instructed to avoid hiring new people, but denied that he was instructed not to recall anyone in order to avoid Magic Number pension qualification.

Bell II, identified as the "Least Cost Personnel System," contemplated the "transfer of volume from a 'deserving' to an 'undeserving' plant." (PX 782 at 028477) So intent was Continental upon achieving its objective that it accepted plant wide seniority, something which it had opposed for many years, because it determined that it would be easier to implement the Liability Avoidance Program with plant wide seniority. Edward Playto, who held an international position with the USW until 1980, testified in depositions that the Union favored plantwide seniority because it would serve to protect the senior employees in the event of a layoff.

For Continental, plantwide seniority was recognized as providing the "greatest liability control potential." (PX 368 at 057661) This may have accounted, at least in part, for Continental's willingness to accept plantwide seniority. Other reasons also existed, but it was one of the considerations and provided "good potential for employment level control which is a major objective of work force management." (PX 10293) Negotiating plantwide seniority assured "improved control over long term unfunded liabilities" (PX 3703 at 012526) and was so recognized in Continental's labor strategy.

Although defendants contend that the decisions regarding layoff, job combinations, etc., were all made at the local plant level by the managers in charge, the fact is that the liability avoidance system was imposed company wide, and the need to avoid recalls was made abundantly clear to local managers. The desired interrorem effect was set forth in a 1977 speech made by Continental's Vice President of Human Resources as follows:

The liability avoidance tracking system known as red flag is integrated with the weekly payroll and is triggered when an employee classified as permanently laid off is returned to work. A demonstration of the sensitivity of the red flag system took place during the week of May 9. A nurse at one of our plants with three years of service had been coded improperly as a permanent layoff. When she returned to work, the red flag was immediately triggered. A preliminary investigation was completed and forwarded to Mr. Bainton and all other levels of our management within 24 hours. This example is indicative of the sensitivity of our control system and the dedication of our management team to make liability avoidance take place. (PX 750 at 137592).

The "red flag" system had the imprimatur and threat of review by Mr. Bainton himself. He was so identified to convey the importance of capping and the prohibition against recall. (PX 744B) (PX 728) Richard Torrito was proffered by Continental Can as its Rule 30(b)(6) designate, to testify regarding status codes and Bell II. He claimed that the red flag system was a way to monitor plants so that there would not be a "casual" recall of a person. That testimony, of course, is contrary to the purpose as set forth in all of the internal documents which relate to the "red flag" system.

No stronger proof supports the plaintiffs' claim than the "red flag" system. Why would an executive vice-president have to be advised and approve or reject a recall decision at the plant level? The only rational explanation lies in the need to avoid Magic Number benefits. No other credible explanation has been offered. The system made certain that the advantages gained by "cap and shrink" were not to be eroded by subsequent recall action or transfers.

The concern that transfers also might interfere with the Liability Avoidance Program is reflected in company documents. (PX 5849) Documents also reflect that transfers were prohibited if they interfered with the program. (PX 2149)

Although Continental claims it was intent upon protecting senior workers, the desire to prevent qualification was paramount to the need to shelter vested employees. It was recognized that it might be necessary to lay off vested workers in order to keep many more from qualifying.

There are two fundamental principles contained in the concept referred to as avaoidance [sic]. First, we must be very careful that our plans make every attempt to avoid, insofar as practicable, triggering liabilities already vested in Rule of 65 and 70–75 qualified employees. Secondly, we must, wherever appropriate, shrink and shelter our work forces in order to prevent currently inexpensive D.V.B.'s from migrating into the very expensive Rule of 65 and 70–75 category.

These two concepts of avoidance can be mutually competing objectives. In order to put a tight shelter on a particular plant, it may be necessary to place 70–75's/Rule of 65's on permanent layoff in order to prevent a large group of D.V. B.'s from migrating into high liability categories. (PX 763 at 000750)

This clearly confirms the prominence of this goal in all relevant decisions and its overriding importance to those decisions.

It was also apparent that the Continental policy was concerned with layoffs only for a five-year period. Once the five years had passed and the employees had lost their recall rights, rehires could be made without contemplating the previous liabilities. In a memorandum dated May 6, 1976, the notation appears: "ERISA hangups with 5 yr. service bridge" (PX 1870) demonstrating not only an awareness of the purpose of the action but knowledge of its potential for illegality.

One cannot help but wonder if the actions of Continental were as innocent as they contend—why the great emphasis upon secrecy? It is understandable that any company considering plant closing and layoffs might wish to keep that information confidential until a decision had been

made, but much more was involved in this matter. Most significant is the fact that those who were permanently laid off were not advised that they would not be recalled.[9]

The fact that employees were designated as permanently laid off was intentionally concealed from them, depriving them of rights, benefits and options they otherwise would have had if the information had been properly disclosed. An internal document concerning one of the plants states the following:

Eliminate allusions to programming the volume to the attriting workforce. Don't want to be accused of manipulating work force to avoid benefits even tho we are. (PX 3545 at 112213)

Conscious of existing litigation, Continental made changes in documents to conceal the true purpose of corporate actions, including the capping of St. Louis. (PX 1841A at 022194) A memo prepared in November 1984 originally stated that "good manufacturing performance in the plant is restricted by work force limitations designed to limit future people liabilities". General counsel for Continental struck out the words "to limit future people cost liabilities", and replaced the sentence with "manufacturing efficiency in the plant is adversely affected by a burdensome union agreement". (PX 3700 at 130638) In an effort to suggest that the Liability Avoidance Program was really meant to shelter senior workers, it was suggested that hence forth "work force shelter" should be substituted for "cap".

STRICTLY CONFIDENTIAL

For your information the term "CAP" as applied to our workforce has been changed to "Workforce Shelter". This new term means the same as "CAP". (PX 8763 at 002799)

The need to conceal this program from the workers is manifested in numerous documents.

Enclosed you will find a Human Resources White Paper on the CCC–USA Bell System. We believe the information will be of value in better understanding the Bell System and its implications when formulating the Strategic Plan. The White Paper addresses a sensitive and complex issue. For this reason the paper is highly confidential in nature with limited distribution. Do not reproduce the paper. Routing should be confined to your immediate staff only and under no circumstances should the paper be sent to any plant locations. (PX 268A at 065561)

The permanent layoff code designations were deleted from the Payroll Manual in a further effort to conceal the true purpose of the codes while continuing to utilize them. (PX 422) Although the codes were deleted from publication, they were continued in effect. The obvious purpose was to keep the codes secret and deny the employees knowledge of their designation. (PX 2692) As a result, employees were denied pursuing options which otherwise would have been available to them had they been fully informed.

Although defendants now dispute the extent of the savings from this program, there is no question that at the time that it was initiated and implemented, Continental was of the view that the program would result in savings in the hundreds of millions of dollars. As mentioned above, defendants now contend that those figures were unrealistic, because they failed to account for present value or to consider other pertinent factors. But none of that is relevant or material. It is not the accuracy of the predictions that is important, but rather whether they were considered reliable at the time and formed a basis for the actions taken by Continental. Continental's intent is predicated upon what it thought and understood at the time, and retrospective analysis of the validity of the predictions made then is inconsequential. Continental

---

**9.** Throughout this matter, Continental relied upon Con-tin-u-us News, an employee newsletter, to establish the legitimacy of its goals and other pertinent facts. However, it is unlikely and unrealistic to suggest that the employees would be informed of Continental's scheme or that this self-serving newsletter would be a more reliable source than the company's internal memoranda.

believed that by capping the St. Louis plant it could save 23.7 million dollars by 1988. Whether or not that figure is accurate or reliable or valid does not affect or alter the fact that Continental believed it at the time and acted in reliance upon it. Which brings us to the St. Louis Plant.

*St. Louis Plant*

Continental opened its 73 St. Louis plant in 1948. The plant has a factory on the main level, with administrative areas and a cafeteria on another, and contains 436,000 square feet. During the period between 1965 and 1972, the plant employed more than 850 hourly workers and was engaged in producing beverage, food and general packaging cans. Until 1965, it produced three-piece soldered cans made of tin-plated steel. It installed two Conoweld beverage can lines between 1965 and 1968, and a third line was installed in 1973. In 1975, about 90% of the plant's production was sold to Anheuser–Busch at its St. Louis brewery. Consistent with the industry trend in the 1970's, Anheuser–Busch began converting to two-piece cans. However, Anheuser–Busch was desirous of maintaining its steel can purchases in order to assure that the market would continue to be competitive.

In recognition of the growing trend towards aluminum, Continental announced the discontinuance of two-piece steel manufacture in the United States as of October 1976. Although Anheuser–Busch invited Continental to bid on its business, and although Continental had a right of first refusal from Anheuser–Busch, no formal bid was actually submitted for Anheuser–Busch's work in St. Louis. Continental contends that its preference for two-piece aluminum technology, coupled with the unavailability of capital to invest in a two-piece steel facility in St. Louis, prevented it from bidding on Anheuser–Busch's St. Louis brewery's two-piece can business on any basis other than an MSP type contract. Anheuser–Busch was not interested in an MSP contract, and entered into an agreement with American Can. As a result, Continental lost the Anheuser–Busch business, and produced its last 12–ounce can for the St. Louis brewery in April 1979, and the last 16–ounce can for the St. Louis and Columbus breweries a few months later.

During the early 1970's, Continental assembled three-piece Conoweld beverage cans for Falstaff, at 971 Victor, a Conoweld plant, located on the grounds of Falstaff's St. Louis brewery. That plant closed in 1977 when Falstaff decided to shut down its St. Louis brewery. Before the brewery had closed, it had switched to two-piece cans from a supplier other than Continental.

As the result of these circumstances, economies had to be effected at the St. Louis plant. Management made recommendations that the plant improve the quality of its production supervisory personnel, consolidate staff and clerical workers, efficiently use its remaining staff and reduce manufacturing overhead. Efforts were made to increase employee utilization and reduce the number of seasonal employees. An effort was also made to spread vacations over the entire year, and, thereby, reduce the float required to replace vacationing employees. Certain jobs were combined and eliminated. During the period between November 1975 and April 1977, Continental initiated a number of Project Expenditure Authority (PEA) proposals to improve labor productivity. Subsequently, the St. Louis plant also discontinued its soft drink end volume production. Thereafter, Continental obtained a long-term contract with Mead–Johnson and made a substantial capital investment in order to convert the plant from beverage to infant-formula can production. Initially, production lagged far behind the projected learning curve, and there was excessive spoilage and low productivity. Efforts were made to improve efficiency, and the manager of the plant was replaced. One of the subsequent steps taken was to substantially reduce the work force. Changes were made in the equipment and the configuration of equipment.

Mead–Johnson renewed its contract with Continental for four years in 1981. Many employees worked substantial overtime, vacations were spread, absenteeism was con-

trolled, and further job combinations were enacted. James Peak was an hourly employee at St. Louis, and was an officer of the USW local. He testified that the Union permitted the combination of some jobs and did not grieve others, although the local union did oppose job combinations in principle because obviously they reduced the number of employees. He did complain, however, when there was a failure to recall employees despite attrition.

Emphasis had been placed on developing the Mead–Johnson business in view of the uncertainty of the Anheuser–Busch business. Mr. Priest, a retired senior can buyer for Mead–Johnson Co., confirmed that Continental aggressively sought the Mead–Johnson business, and that its contract with Continental was extended both in 1981 and 1986, Mead–Johnson being satisfied with Continental's pricing.

Mr. Popham denied that any business was transferred out of St. Louis and insisted that efforts were made to increase the business at the plant, not to decrease it as plaintiffs contend. (DX 804) (DX 808) (DX 2617) (DX 767) Mr. Popham testified that the Bell System was never utilized to establish manning levels and that unfunded liabilities were never a consideration in those decisions. However, he was aware of the system and had heard of the term "cap". He understood "cap" to mean (in Mr. Rexford's presentation) identifying workers for layoff purposes in order to avoid unfunded liabilities. Mr. Popham denied that strategic plans for St. Louis were implemented and denied the existence of any layoffs made to avoid qualification for pension benefits. Some work was actually transferred into St. Louis during this period. (DX 767 and 2617) Mr. Popham insisted that the strategic plans were merely alternative contingency scenarios—giving consideration to what would be done if certain events transpired.

Despite all of the plans and directions from above, in essence, Mr. Popham testified that liability avoidance and capping directions played no part in the decisions which he made regarding personnel. Can this be? Since Mr. Popham was a sincere

witness, could he have furthered the goals of liability avoidance unknowingly? He claims he was unaware of the Liability Avoidance Program, the assignment of permanent layoff codes or any rearrangement of volume.

However, cost reductions as implemented by Mr. Popham were not inconsistent with liability avoidance. Indeed, they clearly aided in establishing or maintaining the cap line. Therefore, it is conceivable that Mr. Popham's efforts may have furthered the intention of corporate management without he himself having such intent.

But he received documents which talked about a " 'must' cap date" (PX 9483) and discussed the ability to "alter volumes, if necessary, in order to allow volume to fit actual crew sizes, float and attrition." He was also advised of the risk of recalling certain employees (PX 9485) and that there was a "shelter to be in place by late 1977." Mr. Popham understood this to be a "cap". He had heard of the "red flag system" from Mr. Rexford, although he never saw one for the St. Louis plant.

Mr. Popham recognized that upper management was being singled-minded in their focus on unfunded liabilities and he sought to dissuade them and introduce other factors. However, he himself wrote that: "It is very important that we immediately arrive at a uniformly agreed to cap figure for costing out our base possible minimum operation programs" (DX 2489c) and he understood that the "cap" was aimed at unfunded liabilities (DX 2489).

Mr. Popham testified regarding numerous efficiencies which were inaugurated under his direction. They involved transfers of equipment, conversions and realignment which reduced the need for personnel. Equipment was installed and modified which resulted in further personnel reductions. Such reductions resulted from new technology and other accepted manning practices. But whereas Mr. Popham testified that *he* received no specific instructions as to a "cap", Mr. Ryals testified that he instructed *Mr. Bauer* to staff the plant at a 237 employee level. He also testified how that work force was to be allocated

and when the "cap" was to be accomplished. Mr. Ryals insisted that the 237 cap was based upon the volume available and benchmark manning—the standard practice—and he demonstrated the means employed in arriving at that level. (DX 2718)

There is no question that Mr. Ryals was at meetings at which the "cap and shrink" program and the need to designate a "pivot" employee were discussed. (PX 9473 and DX 1814) The use of the Bell System for this purpose was also discussed with Mr. Ryals or in his presence. To suggest that he arrived at a 237 cap independent of these discussions and directions defies reality. The "cap" was fixed by reference to the Bell System and carried out pursuant to it. The steps which were taken to implement it were the very means contemplated by the "cap and shrink" program. Those efficiencies were effected to reduce the labor force to the designated level. The level did not result from the reduction techniques but rather forced them to occur.

Of the 321 laid off substantially all had 249 or 299 codes, (DX 2700) signifying permanent lay off.

Mr. Ryals testified that neutral benchmark manning would have and did result in a work force of 237.[10] In essence, his testimony suggests that the work force number resulted from objective and accepted standards rather than from the imposition of an external and arbitrary "cap". However, there is nothing to suggest that the determination of the cap did not take into consideration realistic manning levels. Certainly the "cap" was expected to handle the adjusted volume. The fact that the manning criteria and the cap arrived at the same number does not refute that the "cap" was implemented. The "cap" was fixed and met. Once the volume was established as a result, of course, the "cap" had to be such as could service that volume. The identity of the "cap" with the required benchmark manning is not a coincidence and does not negate the imposition of a "cap."

Likewise the propriety of the efficiencies and costs savings does not serve to disprove the imposition of the "cap". They were the means by which the level was attained. The fact that they made good business sense is not inconsistent with their underlying purpose. Once the cap was fixed it became necessary to determine the means and methods by which it could be achieved. The fact that the means and methods produced savings is neither surprising nor inconsistent with the overall strategy. In any event, it is evident to the court that the manning was adjusted to the "cap" level, not *vice versa*. The fact that the manning as independently determined met the needs of the volume is a tribute to the accuracy of the predictions, but does not refute the cap's purpose and implementation.

The cap was based upon a "19 year level" in arriving at the 237 figure. (PX 537 at 047848) Manning predicated upon neutral business criteria would not be dependent upon years of service (or age of employees). Efficiencies were utilized to arrive at the cap; they did not cause it. Even if the actual "cap" was not the predicted one, there is no doubt that its purpose, no matter where fixed or adjusted, was to defeat qualification. If the actual cap were different from the projected one, Continental would no doubt rely upon the difference. Having turned out to be identical, Continental seeks to explain the coincidence by reference to other factors. The "cap" was fixed before the efficiencies were identified and inaugurated. As layoffs followed the cap, so did cost savings to implement it.

In 1980 while Mr. Bauer was manager, he implemented further efficiencies in connection with the Mead–Johnson business. He recommended a return to "zero based manning"—determining actual needs as though starting from the beginning. Department heads were so instructed and analyzed their respective situations. Mr. Beckler testified that no mention was made of

---

**10.** Although Mr. Ryals testified that he calculated the 237 manning level without regard to any imposed cap, no documentation of that calculation *at the time* was offered in evidence.

any "cap" in these meetings, nor were Magic Number pensions discussed.

Of course, the failure to mention "caps" or Magic Number pensions is no surprise. Local supervisory personnel might well have revolted had they been advised of the true purpose of the need for efficiencies and labor reductions. Many had worked side by side with the plant workers for years. They were not as removed as the corporate executives from the weaning out process and might have refused to be a part of it. The internal manning reductions are not inconsistent with the over-riding goal of avoiding unfunded pension liabilities.

However, when Mr. Bauer was being interviewed for the position of plant manager at St. Louis, he specifically asked if the plant was "capped". One must assume that such an inquiry was prompted by the knowledge that there was such a thing as a "cap" and that it was sufficiently known and implemented in the company to warrant such an inquiry.

Mr. Bauer testified that Mr. Ryals instructed him in October of 1980 to have a cap of 237 by December 31, 1981. At the time there were approximately 290 employees, and approximately 250 were budgeted for 1981 according to Mr. Bauer. Mr. Ryals did not explain the imposition of this arbitrary number to Mr. Bauer. When Mr. Bauer was confronted with the fact that Mr. Ryals testified that he required a level of 237 employees by the end of 1980 rather than 1981 as he testified, he insisted that 1981 was still his recollection. The court specifically concludes that Mr. Ryals fixed the "cap" for 1980. (PX 537 at 047848)

> Considering that our current contract with Mead Johnson expires at the end of 1982, and that a new Steel Worker's contract will be negotiated early 1981, it is essential that we position ourselves to the lowest unfunded liability level by 12/31/80; therefore, we are proposing to reduce the P & M workforce at 73 St. Louis to a 237 level by the end of 1980 but maintain the option to increase from this level (not to exceed 316) in the event we renegotiate a continuation of the

Mead Johnson business and a favorable Steel Worker contract or an excellerated attrition rate, obviously this option would only be implemented as a result of sound economic and/or business needs.

Further confirmation of the 1980 "cap" appears in the following memorandum:

> In summation, we must position ourselves to be at the lowest unfunded liability level by the end of 1980 and at the same time have the ability to react to business or economic changes. Capping at the 237 level with the option to increase when/if justified affords us maximum business flexibility. (PX 9528 at 024506)

Mr. Ryals testified that Mr. Bauer participated in development of the 237 number for manning. Mr. Bauer, on the other hand, testified that he did not know how the 237 number was arrived at. When Mr. Ryals directed him to reduce the manning to that level by a certain date, Mr. Bauer responded with an obscenity corroborating neither his participation in nor knowledge as to the means by which the 237 number was determined.

The work force reduction efforts outlined by Mr. Bauer are set forth in DX 2407. The steps taken and contemplated were directed at changing "the size of the operation" and the "attitude and spirit of the organization."

As stated above, Mr. Bauer testified that avoiding liability for pensions played no part in *his* manning actions and decisions. Even if true, his personal motives do not supplant the overall corporate motive. He was instructed to make the plant more efficient and to reduce manning. With that directive he set about that task. When he was instructed to arrive at a particular level, he complied. He carried out the corporate intent and purpose. He did *not* say that the pressures from above did not affect the timing of the actions which he took or the extent of the reductions which resulted. He was instructed to effect work force reductions and to bring them to a specific level. The fact that he carried out that responsibility allegedly ignorant of management's purpose does not establish

that those same actions would have occurred absent the improper purpose.

Mr. Bauer's calculation of manning mirrored the same calculation as done by Mr. Ryals, demonstrating Mr. Ryal's ability to fix a realistic cap based upon his own experience and abilities. In fixing the cap, Mr. Ryals was able to foresee its accomplishment. He correctly forecast that a cap of 237 was attainable and workable.

Mr. Bauer's testimony also reflects that the work force management techniques had the further benefit of generating a profit by improving productivity. (DX 1603) This, of course, does not prove that the same actions would have been taken at the same time absent the desire to avoid qualification for pensions.

Although the existence of a "cap" at St. Louis is denied, a memo dated September 8, 1977 states that the "cap" "is now a reality". (PX 1811) In choosing to rely upon the documents rather than the testimony which purports to contradict them, the court relies upon the consistency, repetition, wide distribution at the highest levels and the lack of any challenge or denial in any documents generated at the time.

The official cap level was fixed in a memorandum from Mr. Walker dated September 28, 1979. (PX 1845L) The actual layoffs corresponded precisely to that cap line. The cap was fixed at 237 (PX 537 at 047848) and occurred as projected.

> It is readily apparent when you review the above numbers that all current employees are rule 65/70 qualified and/or 70/75 qualified or each worth $100,000 in unfunded benefit liabilities. The last capping action to take place at the St. Louis plant was at the end of 1980 bringing the Plant's population to the current level of 237. This capping action required the layoff of 163 hourly employees with seniority dates ranging from 08–14–61 to 09–09–68. A prior capping action took place during 1976 and 1977 wherein 178 employees were laid off, their seniority dates ranged from 9/9/68 to 9/10/73. Since this action took place, 49 employees have broken employment with Continental and the remaining 129

> will break employment (exhaust recall rights) by the end of 1982. (PX 819L at 067902)

In 1981 Mr. Bauer asked permission to recall 28 employees and that request was denied. Mr. Bauer concluded that those people were necessary, and yet the recalls were not permitted, consistent with the desire not to retrigger qualification for benefits. Mr. Bauer was concerned that without sufficient personnel, the business might be transferred to another plant.

Interestingly, Mr. Bauer never understood that he was to shelter senior workers who had already qualified. Quite to the contrary, his efforts were constantly directed at *reducing* the work force, never *maintaining* it at any particular level. The pressure at St. Louis was to reduce the manning levels. The "cap" fixed the maximum, not the minimum. He was told the *most* number of employees he should have—not the *least* number.

By coincidence, before he became plant manager in St. Louis, Mr. Bauer chaired a study and submitted a report to upper management. (PX 17843) In that report he recognized and emphasized the significance of unfunded liabilities. It is unlikely that such knowledge and purpose escaped him in his capacity as plant manager in the actions taken by him in the succeeding years. But whether or not he was personally motivated by such intent is immaterial.

Dr. Sider, an economist called by Continental, presented evidence as to the amount of time it would take for each class member to qualify for Magic Number benefits. The calculation at St. Louis was based on the last day worked and gave benefit for "creep." (DX 2100) A chart prepared from the underlying data (DX 2096) indicates that 1 person was less than 1 year from qualifying, 30 were 1 to 3 years from qualifying, 37 were 3–5 years from qualifying, and 78 were 5 to 10 years from qualifying. 168 persons were more than 10 years from qualifying. 7 were actually eligible for Magic Number benefits.

Plaintiffs contest the accuracy of some of these numbers and conclusions, but the differences are not material. The fact that many of the persons laid off were far distant from qualifying does not detract from the evidence as to the specific intent of Continental. Even if on reflection, the strategy did not make sense or was not necessary, it nonetheless was established and followed.

A similar chart was prepared as to all claimants (DX 2094) indicating the same type of information regarding the various categories for qualification. Both charts included non-USW employees, which would affect the numbers and percentages, although not significantly.

There is no question that many persons far from qualifying and many who were not USW members were laid off as part of the process and strategy. For the reasons mentioned above, it was inevitable and unavoidable that this would happen if the means adopted was to establish a cap line. Those below the line, many of whom were not the immediate intended victims, would be laid off and swept away by the overall strategy. Seniority mandated this result. It was even necessary to lay off a small number who had already qualified—a result clearly contemplated by the plan. (PX 754 at 003 000751)

Throughout, Continental contended that none of its decisions, particularly those in reference to layoffs, were intended to avoid liability for pensions, and that said layoffs would have occurred irrespective of whether or not Continental had developed a Liability Avoidance Program.

In deciding what action was to be taken at St. Louis, an analysis was made based upon varying scenarios and their effect upon unfunded liabilities. (PX 1801) The ultimate decision was predicated primarily upon the maximum liability avoided. Again it is not the analysis which violates the statute, but the use made of it in the decisions which followed.

■ The existence of the Liability Avoidance Program and its nationwide application gives rise to a reasonable and compelling inference that those employees who were laid off at St. Louis were victims of it. The fact that the strategy was to be implemented in St. Louis is confirmed in PX 5803A at 067176. Volume was to be reassigned with "people liability exposure" as the prime concern. All but 11 of the 320 employees who were laid off at St. Louis had received a 249 or a 299 status code. Clearly, St. Louis was one of the targeted, high liability plants. Scattergraphs were prepared showing qualifications for the 70/75 pensions.

The intent and use of the scattergraph as it pertains to St. Louis is apparent from the notations made by Mr. McGrath (PX 763 at 000749). The cap line divides "prevent" and "shelter"—the two announced goals. (PX 763 at 000750)

There was a rush to put St. Louis on the Bell System. At a meeting held on June 1, 1976, it was determined that

> St. Louis must be capped no later than December, 1978.... We must select an operating program that provides at the capped level the minimum personnel liability at the end of 1981.... (PX 1803A at 066563)

As early as 1976, it was contemplated that St. Louis would be capped as of 12/31/77. (PX 5803 at 067156) The plan to cap St. Louis is specifically set forth in a confidential document dated June 9, 1976. (PX 20640) (PX 743) The necessity of maintaining the cap is illustrated dramatically in a memorandum dated September 5, 1985.

> During most of this year we have experienced an accelerated level of attrition at our St. Louis plant. We started 1985 with 209 employees on our active USW roster and today have 193 remaining. We project that by the end of January 1986 it will be 183.
>
> Our goal has been to maintain the business at St. Louis within this workforce while also attempting to qualify backup locations to meet the contractual agreement with Mead Johnson. (PX 10300 at 000901)

As part of the PUP plan, there was an early removal from St. Louis of 3 minster presses and benchmark oriented manning

reductions totaling 34 hourly positions. (PX 5227 at 067127) However, business volume actually increased after the minsters were sent out of St. Louis. (DX 831) The original St. Louis PUP called for capping the plant by eliminating steel press end-making, and coil line activity, lithography and minster operations were to be reduced. (PX 800 at 066841) Decisions as to what work was to be performed at the plant followed the capping decision.

The "pivot" employee for capping purposes at St. Louis was designated in a memorandum dated April 29, 1977. (PX 9474) The actual capping on the seniority roster three years later was only one person removed from the "pivot" employee designated in the foregoing memorandum. The court finds that this was not a coincidence, but rather the carrying out of the specific plan as it related to St. Louis. Capping at St. Louis was fixed at 237 USW workers and layoffs were carried out pursuant thereto. (PX 819 1 at 067902).

It was the capping program which determined who would be laid off, and it was the goal of avoiding Magic Number benefits which governed that decision and fixed the "pivot" person on the roster. Capping was utilized for the same purpose at numerous other plants. The decisions as to the number to be laid off were predicated upon pension considerations and not upon available volume. The volume was adjusted to the cap, not *vice versa.*

There is substantial controversy between the parties as to the failure to obtain the contract referred to above from Anheuser–Busch at this period of time. Retention of this business would have employed 200 persons. Although Continental contends that it submitted a bid which was rejected, the evidence indicates that no formal bid was ever submitted, and merely that Continental was under the impression that Anheuser–Busch did not want Continental to do this work. It is apparent that Continental did not actively pursue this contract as it would have under normal circumstances, but resolution of this conflicting scenario is unnecessary. The court can make no determination as to the specific reason why Continental did not obtain the Anheuser–Busch business. The right of first refusal between Continental and Anheuser–Busch is set forth in PX 24308. It was not exercised, and that failure was not satisfactorily explained. One thing that is apparent is that Continental's alleged reasons for not obtaining the business have not been consistent and a variety of rationales have been offered, sometimes conflicting with each other. The court cannot on this record determine why this business was not obtained, but does find that liability avoidance played a role in that decision, although other legitimate factors may also have been involved. The amount of business from Anheuser–Busch was to be only that "volume that can be produced within the residual manning under the cap." (PX 5803 at 067161) It is likely that if it had not been for the emphasis on liability avoidance, Continental most probably would have found a way to acquire this business, or at least would have pursued it more actively than it actually did.

Patrick Stokes was in charge of purchasing cans for Anheuser–Busch in January of 1976, and he confirmed that Anheuser–Busch was interested in maintaining a balance between breweries that purchased aluminum cans and those that purchased steel in order to make certain that the supply remained competitive. He testified that American obtained the business because of Continental's refusal to make steel cans and its insistence on an MSP contract. It is thus apparent that Continental most probably could have obtained the Anheuser–Busch business if it were willing to accept the terms and conditions set forth in the agreement with American. It chose not to do so.

The volume expected from Mead–Johnson was much less than for Anheuser–Busch. Volume was about one half what had been produced for Anheuser–Busch. Two-piece under Anheuser–Busch would have required fewer workers, approximately 200, because the lines were less labor intensive and higher speed. St. Louis could have accommodated both Anheuser–Busch and Mead–Johnson business resulting in few or no layoffs. Of course, substantial

capital expenditures would have been required, particularly for the two-piece line. As mentioned above, a large investment, in fact, was made in order to obtain and service the Mead–Johnson contract.

The productivity on the Mead–Johnson contract initially was very low. As it improved, reductions in manning became possible and were implemented. Bernard Richard Juskie confirmed the initial difficulties in supplying Mead–Johnson, particularly with respect to quality, productivity and speed. The early problems were viewed as something that could be overcome, and it was recognized as important to do so because the business "shelters a high liability plant." (DX 1133) "St. Louis will be a positive income contributor for 1981 and out and at the same time, reduce its unfunded liability from $22.3mm to $11.4mm by 1985". (DX 1133 at 111X136095)

The 1980 layoffs were to be done gradually rather than in the last months of that year.

> ... [C]urrent manning levels should be monitored and reduced throughout the balance of 1980 to insure an orderly reduction of personnel while moving toward the adjusted year-end headcount gradually, rather than in the final few months. (DX 1144 at 066367).

Mr. Kromenhoek testified that strategic plans were not the same as reality. However, they clearly represent the intention of Continental. Secondly, efforts were made to accomplish the goals set forth in those plans. The fact that they did not result as precisely envisioned does not negate their evidentiary significance. The goal of a 237 level was sought and repeated even with the Mead–Johnson business assured. But even if the Mead–Johnson business continued it was still considered necessary to eventually close the St. Louis plant (DX 1176).

That strategy can only be justified by reference to the avoidance of unfunded liabilities. The fact that the closing did not occur signifies an adjustment to actual conditions, not an abandonment of the cap or its purpose.

As the Mead–Johnson learning curve improved and the lines operated more efficiently, fewer employees were needed. This was clearly contemplated, but took longer than projected. Thomas C. Faciszewski testified during depositions as to the job combinations and other efficiencies which reduced the number of hourly workers in connection with the Mead–Johnson business. He confirmed that the plant ran ten assembly lines with the Anheuser–Busch business, but it needed only six for Mead–Johnson. However, these events are in no way inconsistent with the manning levels envisioned by the "cap". The vagaries of the business necessitated a lack of precision in the timing of the "cap's" implementation.

To accept Continental's theory the court would have to conclude that the goals and directives from the highest echelons of corporate management were ignored and that local management made manning decisions in disregard of those goals and directives. Nothing in the history of the company suggests such a renegade atmosphere. Quite to the contrary, adherence to corporate directives was the unerring policy of subordinate management. That directive from the highest level is set forth in great detail in Improving Work Force Utilization Bell II. (PX 27003)

All of the local actions which were taken are consistent with the directives set forth in that document. It was a road map which was ultimately followed at St. Louis to a substantial degree, if not in every category. It is also consistent with the testimony of local managers who attempted to improve efficiency and reduce personnel.

As previously stated, if Continental's sole purpose was to shelter senior employees, why limit (cap) the size of the work force? Hiring more than the sheltered work force certainly would not defeat that goal. If sheltering was the only goal, Continental would have fixed a minimum rather than a maximum. The obvious and true purpose of the cap was to prevent others from qualifying for Magic Number benefits

as well as sheltering those who had already qualified.

The court is satisfied and so finds that the layoffs and the failure to recall at St. Louis were pursuant to the Liability Avoidance Program. Direction was given that a cap be fixed at St. Louis and such was done, although revised from time to time. On June 26, 1980, a confidential memorandum was prepared which contained the following:

[I]t is essential that we position ourselves to the lowest unfunded liability level by 12/31/80; therefore, we are proposing to reduce the P & M work force at 73 St. Louis to a 237 level by the end of 1980 ... (PX 1825A at 066368)

The projections of manning levels at St. Louis extended from 1975 to 1985. (PX 7614) Mr. Mueller testified that the actual manning levels were substantially in accord with those established in 1975, representing further evidence that the manning was fixed and the volume adjusted accordingly.

■ The court finds that the cap established at St. Louis had the objective to "minimize future unfunded liability while protecting the existing profitable business base". (PX 1841A at 022193–5) What Continental describes as efficiencies, such as the utilization of overtime, the rescheduling of vacations, the combination of positions, etc., were in reality adjustments to the reduced and capped work force.

Cross training was also initiated to keep from recalling those on layoff, even though such training was more expensive for the company and raised psychological problems for the older employees. (PX 763 at 000756 and 000763) Here again, although those actions viewed in a different setting might be considered perfectly proper, in the context of this case, it is evident that they were a reaction to and a result of the capping program. All of the strategies and methods which were extant at the company-wide level were applied to St. Louis. Employees at St. Louis were designated as permanently laid off and given special status codes, and the "red flag" system was implemented.

In 1984 Continental recorded that St. Louis was presently "under a Division cap and project our work force to drop from 224 people 12/31/83 ($24.5MM) to 149 people in 1988 ($16.9MM)" (PX 23324 at 0006273). Placing the cap level at 237 employees is confirmed as an action that "*did take place.*" (PX 9526). The document also reflects high-level consideration, knowledge and confirmation of the capping of St. Louis. It is contrary to all of the testimony submitted by Continental denying the application of the plan to St. Louis and its implementation there. It is correct that certain laid-off employees were recalled, but the court does not find this inconsistent with the overall strategy because of the small numbers that were involved. The recalls were not inconsistent with the strategic plan, (PX 1831A) which contemplated hiring above the 237 cap if circumstances warranted.

The size and timing of the recalls in St. Louis do not refute Continental's overall strategy. This suit was started in early 1983. Prior to April 1983 only 13 employees had been recalled (DX 2711). Knowledge that this suit was going to be filed existed. Other suits had already been instituted. USW had complained of the conduct charged herein. Therefore, the small number of employees recalled and the time period in which they were recalled renders such recalls of little significance compared to the overwhelming evidence of the implementation of liability avoidance at the St. Louis plant.

*The Same Loss Defense*

■ Having concluded that Continental established a Liability Avoidance Program specifically aimed at denying Magic Number pensions to United Steel Worker employees, and that it implemented that program nationwide and at St. Louis, the court must consider Continental's claim that the losses sustained by its employees would have occurred in any event and that, therefore, plaintiffs have not been injured by the illegal conduct of Continental. The court has previously found that the Liability Avoidance Program pervaded decisions as to which plants to close or retain, which

work to accept or reject, where such work should be performed, where equipment should be located, which employees should be laid off or retained, and which employees should be recalled, and under what conditions. In order to consider defendants' same loss defense, it would be necessary for the court to extract the Liability Avoidance Program from that multitude of actions and find what would have occurred had it not been for the illegal conduct of Continental. The court finds this task to be impossible and insurmountable.

For instance, Mr. Bauer's testimony does demonstrate that efficiencies were necessary and justified. The work force was underutilized and in some instances unnecessary. As a result, through better utilization and related changes, layoffs were inevitable. However, because of the constant spectre of liability avoidance, the court cannot conclude that those actions would otherwise have been taken when they were taken. There is no doubt that layoffs would have and should have occurred at some point, but the timing and the identification of those to be so designated was moved primarily by the desire to avoid unfunded liabilities. The court finds it impossible to extract that overriding consideration from Continental's decision-making and determine what would have happened were it not for this primary goal and when those events would have occurred.

Furthermore, the court finds nothing inconsistent in the need for greater efficiency in work force management and implementation of the Liability Avoidance Program. "Capping" by its very nature required greater efficiencies and work force reductions. Therefore, the onslaught of economies as described by Mr. Bauer does not refute that liability avoidance was one of its main purposes. Higher productivity is not inconsistent with liability avoidance. Any step which promoted layoffs served the purpose.

If the plaintiffs contend that *all* of those who were laid off would still be employed "but for" the Liability Avoidance Program, the court rejects that contention. The Liability Avoidance Program established the pivot level and timing of layoffs. Some of those persons would have been laid off eventually in any event. What Continental's actions have done is to prevent the court from determining who would have been laid off and when absent the illegal purpose. The court certainly cannot determine who among the class members otherwise would have been laid off before they qualified for Magic Number pensions.

The main witness for the defendants' "same loss defense" was Dr. Paul W. Marshall, who possessed extraordinary credentials and amassed significant underlying data. Indeed, Dr. Marshall and his firm expended 15,000 hours in the preparation of his opinion for this and other related cases, and was paid in excess of $2,000,-000.00 for his services by the defendants. (DX 2782 III) Although Dr. Marshall conceded that he submitted drafts of his opinion to counsel for the defendants and made certain changes as a result of their suggestions, the court is satisfied that in large measure the opinions rendered represent his own professional judgments in respect to the matters at issue.

Initially, Dr. Marshall confirmed the findings set forth above respecting the general industry conditions. His charge was to determine whether the layoff actions taken by Continental would have taken place in the absence of the Liability Avoidance Program. In doing that analysis, all economic incentives which grew out of pensions were to be eliminated from his retrospective analysis. Standard criteria were then employed to determine what would have been done absent the goal of liability avoidance.

Particularly in respect to the St. Louis plant, Dr. Marshall examined the 321 claimants who were actually laid off. He attributed those layoffs primarily to the decline in volume and the change in the mix of business attributable to the loss of the Anheuser–Busch account.

In his opinion, Anheuser–Busch decided to end reliance upon the three-piece can and that decision, of course, was not influenced by Continental's Liability Avoidance Program. It was Dr. Marshall's opinion

that if other business had not been obtained, the plant would have been closed.

Based upon his review of the appropriate records, he concluded that Continental took affirmative action to avoid closing the plant, and that business was either transferred in or new business obtained, but it was his opinion that the loss of volume over a four-year period, coupled with the change from the Anheuser–Busch business to that of Mead–Johnson, required layoffs, and that 438 separations were attributable to that loss and change in volume.

Dr. Marshall compared the total expected separations with the actual separations and reported same in DX 2782 VII, St. Louis 13. That analysis concludes that for the years 1976 through 1982, there were a total of 554 actual separations as compared to expected separations in the amount of 499. In 1976, there were 160 actual, 133 expected; 1977, 127 actual, 111 expected; 1978, 34 actual, 159 expected; 1979, 30 actual, 51 expected; 1980, 165 actual and 45 expected, according to his calculations.

Dr. Marshall conceded that if the Anheuser–Busch business had been obtained or retained there would have been no labor reduction, assuming appropriate benchmark manning. Dr. Marshall did not testify, nor could he, as to when class members would have been laid off absent the Liability Avoidance Program. Even his predictions as to when the layoffs would have occurred do not coincide with those which actually occurred. Therefore, although there might be some other basis to explain the discrepancy between the actual and expected layoffs, if one were to accept Dr. Marshall's underlying premise, even the discrepancies in his predictions as opposed to the actual separations are more probably than not due to the Liability Avoidance Program.

In the court's view it is impossible to conclude that any particular layoff or layoffs would have occurred in any particular time period absent the goal of avoiding unfunded liability. Notwithstanding Dr. Marshall's obvious competence and thoroughness, the court rejects his opinion that the persons who were laid off as a result of the Liability Avoidance Program would have been laid off in any event so as to prevent their qualification for Magic Number Pensions. Even based upon Dr. Marshall's own analysis, reductions at Continental exceeded the industry averages.

It is evident to the court that the foundation of Dr. Marshall's opinion is predicated upon the amount of volume at the St. Louis Plant. The projected reduction in labor is predicated upon the actual reduction in volume. However, as set forth above, the amount of volume was so influenced by the Liability Avoidance Program that it is impossible to predict what would have happened absent such program and its effect on volume. The acceptance, rejection or transfer of business had as its primary goal the avoidance of unfunded pension liability. The heart of Dr. Marshall's opinion is that reductions in labor naturally followed the reductions in volume. However, the actual reductions in volume cannot be divorced from the Liability Avoidance Program, and the court cannot find that they would have occurred as they occurred absent that program.

In essence, the court concludes that neither an expert nor the court is able to determine what layoffs would have occurred or when they would have occurred absent the goal of liability avoidance, because of its pervasive influence in all management decisions, particularly those relating to volume and its location. In this respect Continental concedes that it has the burden, and the court finds that it has not met that burden.

The rebuttal to Dr. Marshall's opinion is once again found in Continental's own documents, in which the following appears: "If we did not cap, shrink or shutdown plants as necessary, CCC–USA's unfunded liabilities would exceed our current estimate by $100 MM in 1979 and $198 MM in 1984." (PX 3547 at 172172) In that same document Continental indicates unfunded shutdown liabilities *without* PUP actions beginning in 1972 of $482,000,000, extending to 1984 in the sum of $515,000,000,00, and states "when we size our business by our work force and unfunded liability, we

have leveled off any growth in our unfunded liability with our PUP Action Plan." The Continental documents conjugated liability avoidance, and say in effect: we *will* avoid unfunded pension liabilities; we *are* avoiding unfunded liabilities; and we *have* avoided unfunded pension liabilities. Continental has not and cannot establish that the layoffs which were caused by that program would have occurred in any event.

It may well be, as many of Continental's witnesses testified, that absent the actions taken at St. Louis the plant might have been closed. Clearly the actions taken sheltered senior employees and kept them at work. Of course, even this action was not altruistic but rather avoided paying employees for not working. But that benefit conferred cannot justify the concomitant detriment to those who were improperly laid off. Having been primarily motivated by impermissible considerations, Continental's conduct cannot be excused by relying on the good accomplished in maintaining the plant operation. Indeed, it is apparent that the survival of the operation was part and parcel of the original strategic planning.

Furthermore, Continental has not and cannot prove that the St. Louis plant would have closed. The court finds that the plant would have been kept open in any event to shelter senior employees. That result could have been accomplished without also targeting for layoff those employees who had not yet qualified for Magic Number Pensions. The first alternative required a *minimum* number of employees. The second alternative required a *maximum* number of employees.

The latter alternative was chosen—a "cap"—not a bottom. Protecting the senior workers who had qualified did not require a "cap", but ridding the company of those who had not yet qualified did.

A total shutdown such as that which occurred at 971 Victor might make it possible to conclude that certain employees would have been laid off in any event. But even a total plant shutdown does not necessarily prove the "same loss defense", because of Continental's practice of transferring volume, equipment and employees. Therefore, the fact that a plant was closed may not necessarily establish the "same loss defense".

Since St. Louis was not a total shutdown, Continental cannot avail itself of the reasonable inference which might arise from a uniform layoff of all employees at a particular plant. Furthermore, there is substantial evidence that even decisions regarding total shutdown were substantially influenced by the goal of avoiding unfunded liabilities. (PX 7106). To exclude that consideration from the equation is virtually impossible. Although defendants contend that St. Louis was something of a white elephant, documents indicate otherwise. (PX 9477 at 0011770 and 9493) There was and is good reason to continue its operation above and beyond sheltering the senior workforce.

The Liability Avoidance Program so pervaded the strategic decisions of Continental that Continental cannot, and has not met its burden of establishing what would have happened in its absence. Realistically, there is no doubt that *some* plants would have been closed, *some* would have had their work forces reduced, *some* work would have been reassigned, *some* employees would have been laid off, and *some* employees would not have been recalled, but those vague conclusions do not sustain defendants' same loss defense. In order to establish said defense, Continental has the burden of satisfying the court through a preponderance of the evidence that identifiable individual class members or groups of class members would have been laid off in any event before they qualified for Magic Number benefits and would not have been recalled. Defendant has not met that burden, because the virus of its own illegal conduct so infected its decisions that it cannot now establish what would have happened absent that conduct. Indeed, were it not for the direction of the Third Circuit in *Gavalik*, this court might well be of the view that Continental should be estopped from even asserting this defense. Having denied even the existence of the plan, it ill behooves it to now assert that the injuries

sustained by its employees would have happened in any event. But there is no reason for the court to impose such an estoppel, since it finds, without hesitation, that defendants are unable to prove that these employees would have suffered the same fate in any event.

## CONCLUSION

In summary, the court concludes and finds that

1) Continental developed a plan to prevent employees from satisfying the requirements for Magic Number Benefits.

2) That plan was supported by a secret and sophisticated computer program which permitted Continental to identify those persons who should be laid off and not recalled.

3) The plan was implemented nationwide and at the St. Louis plant in particular.

4) The plan was a major and determinative factor in deciding whom to lay off and not recall.

5) The plan was a major and determinative factor in deciding which plants to close or "cap and shrink"; what work to accept or reject; where such work should be performed; whether and where workers should be reassigned; whether equipment should be acquired or moved; whether new plants should be constructed, and if so, where.

6) As a result of the creation of the plan and its implementation, class members were denied pension benefits to which they otherwise would have been entitled.

7) Continental has failed to carry its burden of establishing that such layoffs and losses would have occurred in any event.

8) The pervasive effect of the plan was such that it is impossible to find or predict what would have occurred had the plan not existed and been implemented.[11]

■ The court has found that Continental violated ERISA and set upon a deliberate course of conduct aimed at depriving employees of eligibility for bargained-for pensions. The evidence in support of that conclusion comes solely from the files of Continental. Therefore, defendants, unlike in most cases, began the defense of this action having in their possession, indeed, in their sole possession, all of the necessary facts upon which liability has now been predicated. In the face of this overwhelming and unequivocal documentary evidence, Continental chose to deny the existence of the program, deny its implementation *anywhere*, deny its effect upon *any* employee, and finally contend that if the program existed, and if it was implemented, *no* employees were injured thereby.

No one can fault any litigant for engaging in the defense of a claim, particularly one of this magnitude involving hundreds of millions of dollars, if there is a substantial basis to do so and where *bona fide* factual disputes exist. But in this case, despite the overwhelming evidence against them, evidence which has been in their possession since the commencement of this suit and certainly before, defendants have chosen to extend these proceedings, resist discovery, initiate appeals, and in general lengthen the proceeding and increase plaintiffs' expenses. There are times when a litigant must admit its guilt and make amends, rather than defend to the death the indefensible.

In that regard, Continental has indicated its intention to demand hearings as to each of the remaining plants in order to establish that either decisions for layoffs were made in each absent the intent to avoid liability, or if such was the intent and result, that said employees would have sustained the same loss in any event because of external economic conditions. The above findings clearly establish a nationwide policy, implemented consistently and uniformly, and the court has concluded that Continental has failed to meet its burden of establishing that plaintiffs would have suffered the same loss in any event. Neither

---

11. Because of the voluminous documents, the illegibility of some of the page numbers and the overall complexity of this matter, the court reserves the right to correct any factual errors or miscitations to exhibits. Counsel are invited to call any such errors to the attention of the court within 10 days from this date so that appropriate corrections can be made.

the time of the court nor the litigants should be taken up with establishing that which has already been overwhelmingly established. This litigation was begun April 14, 1983, and the class members are entitled to compensation while they are still in a position to enjoy it. They are entitled to the benefits for which they bargained and for which they worked.

Accordingly, the court will appoint Professor George L. Priest of the Yale Law School as a special master for the specific purpose of assisting the parties in the settlement of the remaining issues in this matter and to expedite a determination of the amounts due to class members and the prompt payment of those amounts; or, absent a settlement, recommending a procedure to expedite the determination of those remaining issues and claims. All fees and expenses in connection therewith shall be paid by the defendants monthly as bills are submitted. Counsel for plaintiffs are directed to submit a form of order consistent with this opinion forthwith.

## APPENDIX A

### I. CONTINENTAL

*Stephen Rexford:*

Supervisor of Employee Relations, Eastern Div. (1970–74)

Div. Mgr. of Industrial Rel. for Great Lakes Div. (1974–75)

Special Assignment to CCC–USA Hdq. (1975)

Dir. of Labor Rel. and Strategic Planning (1976–77)

General Manager of H.R. for CCC–USA (1978)

Vice Pres. of H.R. of CCC (1979–1980)

Vice Pres. of H.R. for CCC–USA (1981–1983)

Vice Pres. of Organizational Development and Compensation of CCC–USA (1984)

Vice Pres. of CCC (1985–10/86)

Departed Continental 10/86.

*Donald Bainton:*

Manager of Mfg. for Eastern Div. (1969–73)

General Manager for Pacific Div. (1973–74)

General Manager for Eastern and Mid–Atlantic Division (1974–8/75)

Vice Pres., G.M. of Operations of CCC–USA (8/75–1/76)

Exec. Vice Pres., G.M. of CCC–USA (1/76–77)

Exec. Vice Pres., Pres. of Continental Diversified Co. (1/78–6/79)

Exec. Vice Pres. of Continental Group, Inc. and Pres. of Continental Can Co. (6/79–1980)

Member of Bd. of Dir. and Exec. Vice President and Operating Officer of Continental Group, and Pres. of Cont. Can Co. (1980–81)

Executive Vice President and Operating Officer of Continental Group, and President of Cont. Can Co. and President of Continental Packaging Co. (1982–83)

Retired 7/83.

*Walter Klint:*

Director, Employee Benefits Programs and Secretary, General Pension Board (1971–77)

*R.D. Hofmann:*

Manager of Southwest Div. (12/74–5/76)

General Manager of Corp. Planning and Development, CCC–USA (5/76–1/80)

Executive Vice President of Continental Group, Inc. and Pres. of CCC–USA (1/80–7/82)

Executive Vice Pres. of Continental Group, Inc. and Chief Operating Officer of Continental Packaging Co. (7/82–8/84)

Executive Vice President of KMI Continental Inc. and Chief Operating Officer of Continental Can Co. (8/84–1986)

Exec. Vice Pres. of KMI Continental, Inc. and Pres. and Chief Operating Officer of Continental Can Co. (9/86–8/87)

Left Continental 8/87.

*Richard M. Sylte:*

Supervisor of tabulating at Tampa (7/58–1962)

Assistant Plant Accountant at New Orleans (1963–1965)

Assistant Plant Controller/Assistant Plant Accountant at Houston (1965–7/66)

Staff Accountant at Southeast Division (8/66–5/68)

Management Analyst (5/68–12/69)

Manager of Budget and Controls (12/69–1/72)

Director of Budgets & Controls Measures (1/72–1/74)

Manager of Finance of Gen. Packaging Div. of CCC–USA (1974–10/77)

Director of Financial Planning for CCC–USA (10/77–1/78)

General Manager of Business Planning and Analysis for CCC–USA (1/78–9/80)

Controller for Continental Can Co. (9/1/80–7/81)

Controller and General Manager of Financial Reporting (7/81–7/82)

General Mgr. of Finance of Continental Can Co. (7/82–2/86)

Assistant Controller for Continental Can Co. (2/86–1988)

General Manager of Human Resource Systems and Planning (1989–present)

*Raymond Sloan:*

Vice President and Assistant General Manager of Metals Operations of CCC–USA (1970)

Vice President and General Manager of Mfg. of CCC–USA (1971–74)

Vice President and General Manager of Metal Operations of CCC–USA (1974–75)

President and General Manager of Continental Can International Corp. (1976–80)

Chairman of Strategic Review Committee for Continental Can Co. (1979–80)

Vice President of Continental Can Co. for Corporate Project Development (1980–1982)

Vice President of Continental Can Co. for Corporate Strategy Development (1982–84)

Vice President of Continental Can Co. for Corporate Development (1984–85)

Departed Continental 2/85.

*Monte Sellers:*

Accounting Trainee, Great Lakes Region (3/1/75–10/75)

Supervisor of Accounting, Great Lakes Region (11/75–77)

Financial Analyst of CCC–USA (1978)

Manager of Human Resources Systems of CCC–USA (1979–1981)

*Richard Torrito:*

Industrial Engineer at 72 Pittsburgh, Pa. (1/72–5/74)

Special Assignment, Realignment Manager at Pittsburgh (1973)

Supervisor of Industrial Engineering at 16 Baltimore (5/74–1975)

Supervisor of Industrial Engineering for the 859 Mid–Atlantic Region (1975–1978)

Manager of Human Resources Systems for CCC–USA (1978–1979)

Manager of Human Resources for 865 N. Grand Complex (1979–10/82)

Manager of Employee Relations for Beverage Operations, Continental Can Company (10/82–1985)

Director of Governmental Affairs for Continental Can Company (1985–88)

Assistant General Counsel, Director of Environmental Affairs (1988–present)

*Neil Popham:*

Mfg. Engineer, St. Louis (1965–68)

Engineering, Mgr., Chicago Division Office (1968–1972)

Plant Manager of St. Louis (1973–11/77)

General Manager of Quality Assurance, CCC–USA (12/77–1979)

General Manager of Three Piece Development Engineering for CCC–USA (1979–82)

General Manager of Mfg. and Technology for General Packaging Div. of CCC–USA (1982–1986)

Departed Continental 2/86.

*Bobby Ryals:*

Plant Supervisor, Tampa (1963–64)

Manager of Quality Control, Longview (1965–69)

Superintendent of Plant Operations, Gregg (1970–1972)

Plant Manager of Longview, Texas (1973)

Plant Manager of Cincinnati (8/75–10/77)

Manager of Mfg. for Great Lakes Region (10/77–2/82)

Plant Manager of Cincinnati (2/87–1988)

Departed Continental 1988.

*Eugene G. Bauer:*

Engineering Supervisor at 872 Pittsburgh, Pa. (1970–1/73)

Mgr. of Production Planning Distribution at 872 Pittsburgh, Pa. (1/73–4/73)

Area Manager for Traffic Distribution at 872 Pittsburgh, Pa. (4/73–4/77)

Area Manager for Traffic Distribution at 857 Great Lakes Region (4/77–4/79)

Special Assignment, Heading N.Y. Metropolitan Study Team (1978–79)

Plant Mgr. at 448 Worthington (4/79–6/80)

Plant Mgr. at 73 St. Louis (6/11/80–7/84)

Departed Continental 7/84.

*Kenneth Beckler:*

Carton Stacker at 73 St. Louis (1968)

Employment Clerk at 73 St. Louis (1968–4/72)

Production Supervisor of Press Dept. at 73 St. Louis (4/72–6/74)

Supervisor of Quality Control at 73 St. Louis (6/74–3/78)

Manager of Quality Control at 73 St. Louis (3/78–1980)

Department Manager of Press at St. Louis (1981–1982)

Manager of Press, Coil, and Tin Plate at St. Louis (1982–6/82)

Dept. Mgr. of Shipping at 73 St. Louis (6/82–1984)

Acting Plant Superintendent at 73 St. Louis (1984)

Acting Plant Manager at 73 St. Louis (1984)

Departed Continental (12/84)

Production Supervisor, Assembly Dept. at 73 St. Louis (2/88)

Departed Continental (1988)

*Arthur John Walker:*

Senior Engineer, Technical Services, Continental Can Co. (1971–74)

Senior Engineer, Chicago Tech Center, Intl. Global Marketing (1975–76)

Manager of Technology Assessment, Intl. Global Marketing (1976–78)

Director of Technology and Economic Planning, Intl. Global Marketing (1978)

Director of Business Planning and Evaluation (3/1/79–8/1/80)

Manager of Aluminum Purchasing (8/80–82)

Director of Aluminum Purchasing for Continental Can Co. (1982–1984)

Venture Manager, New Materials (1/85–1986)

General Manager of the CIRCA subsidiary of Continental Can Co. (involving lithography) (1986–1988)

Technical Staff Assistant at Continental Packaging Intl. (1988–present)

*James McGrath:*

Sales Trainee, Midwest Div. (1970)

Sales Representative, Midwest Div. and Omaha Meat Sales (1971–74)

Industrial Engineer at 51 Stockyards (1974)

Supervisor of Industrial Engineering at 51 Stockyards (1975–76)

Manager of Human Resource Information Systems (1977–78)

Special Assignment, Continental Can Co. —U.S.A. (1978)

Div. Mgr. of Finance for Plains Div. (1978–79)

Financial Analyst Midwest Div. (1979)

Regional Accountant, N. Central Region (1979–82)

Controller, N. Central Region and Midwest Division (1982–84)

Plant Mgr. of Shoreham (1984–8/84)

Plant Mgr. of Omaha (9/84–12/88)

Director of Total Quality Management, Food Operations (1/89–present)

*Bernard Richard Juskie:*

Director of Tooling and Equipment, Technical Services Div. (1968–74)

Design Engineer, Operations Engineering Div. (1974–76)

Director of Equipment and Engineering (1976)

General Manager of Engineering (1977)

Manager of Marketing, Northeast Region (1978)

General Manager of Mfg. and Technical Development, Northeast Region (1979)

General Manager of Great Lakes Division (10/79–1980)

General Manager, Container Systems Div. (1981)

Departed Continental 1982.

*John P. Kromenhoek:*

Plant Manager of 16 Baltimore (1971–4/76)

Manager of Mfg. of Pacific Div. (5/76–9/77)

General Manager of Great Lakes Div. (10/77–10/79)

Vice President and General Mgr. of Central Operations (10/79–12/80)

Vice President and G.M. of Food Operations for CCC–USA (1/81–84)

President of Food Operations (1984–present)

*Thomas C. Faciszewski:*

Human Resources Trainee at 15 Cincinnati (1978–79)

Human Resources Supervisor at 73 St. Louis (1979–82)

*Robert S. Mueller:*

Began at Continental (1950)

Production Supervisor Assembly at 73 St. Louis (1961–69)

Dept. Mgr. of Assembly at 73 St. Louis (1969–72)

Plant Mgr. of 971 Victor (1972–77)

Superintendent at 73 St. Louis (1977–78)

Acting Plant Mgr. at 448 Worthington (1978–79)

Superintendent at 73 St. Louis (1979–80)

Acting Plant Manager at 448 Worthington (1980)

Superintendent at 73 St. Louis (1981–82)

Manager of Plant Quality Control at 73 St. Louis (1983–84)

Manager of Quality Control, Press Operations and Coil Shearing Operations at 73 St. Louis (1984–present)

## II. GEORGE B. BUCK CONSULTING ACTUARIES, INC.

*George B. Swick:*

Consulting Actuary and Employee Benefit Plan Consultant (1971–1976)

## III. ANHEUSER–BUSCH

*Patrick Stokes:*

Asst. to Exec. VP (2/72–2/74)

V.P. For Raw Materials Acquisition (2/74–1/76)

Member of Management Committee (2/74–present)

V.P. For Acquisition of Raw Materials and Packaging Materials (1/76–1979)

Group V.P. for Acquisition of Raw Materials and Packaging Materials, Consumer Products, and Intl. Label. (1979–1985)

Chief Operating Officer of Campbell–Taggert Div. of Anheuser–Busch (1985)

Chief Executive Officer of Campbell–Taggert Div. (1985–87)

Chief Executive Officer of Eagle Snacks Div. of Anheuser–Busch (1987–present)

## IV. MEAD–JOHNSON

*James Priest:*

Purchaser of Supplies and Cartons (1961–71)

Senior Supervisor For Infant Formula Can Purchases (1971–87)

Retired 1987.

### V. USW

*Robert Petris:*

Director of District 38, United Steelworkers of America (6/77–present)

Chairman of USW Negotiations for Negotiations with Continental Can (1980–1984)

*Ralph L. Biggs:*

Hourly employee represented by USW at 80 Pittsburgh, California (1959–87)

Vice President of USW Local 5084 of 80 Pittsburgh (1976–79)

President of USW Local 5084 of 80 Pittsburgh (1979)

*Edward E. Plato:*

USW Staff Representative (1963–69)

USW District Director of District 8 and Executive Board Member of the United Steelworkers of America (1969–80)

Retired 11/80.

*James Peek:*

Hourly employee represented by USW at 73 St. Louis (5/59–8/85)

Union Steward at # 73 St. Louis (1964)

V.P. of USW Local 1120 at # 73 St. Louis (1968)

Committeeman of USW Local 1120 at # 73 St. Louis (1971–74)

Grievance Committee of USW Local 1120 at # 73 St. Louis (1974–1982)

President of USW Local 1120 at # 73 St. Louis (1982–85)

Staff Rep. To Intl. Office of USW Dist. 34 (8/85–present)